D.H. Dilbeck 6/28/2024

AO 106 (Rev. 04/010) Application for Search Warrant        AUTHORIZED AND APPROVED/DATE:

# UNITED STATES DISTRICT COURT
## for the
WESTERN                    DISTRICT OF                    OKLAHOMA

In the Matter of the Search of                )
*(Briefly describe the property to be search* )
*Or identify the person by name and address)* )
TRILLIUM HOMES LLC                            )        Case No: M-24-537-STE
LOCATED AT                                    )
14209 N SANTE FE AVENUE, SUITE B              )
EDMOND, OKLAHOMA 73013                         )

## APPLICATION FOR SEARCH WARRANT

I, a federal law enforcement officer or attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property *(identify the person or describe property to be searched and give its location)*:

See Attachment A

Located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim.P.41(c) is *(check one or more)*:
- ☒ evidence of the crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1348 | Securities Fraud |
| 18 U.S.C. § 1956-1957 | Money Laundering |

The application is based on these facts:

See attached Affidavit of Special Agent Jason Wildeman, FBI, which is incorporated by reference herein.

- ☒ Continued on the attached sheet(s).
- ☐ Delayed notice of [No. of Days] days *(give exact ending date if more than 30 days)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet(s).

_____
*Applicant's signature*

JASON WILDEMAN
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date: _____**Jun 28, 2024**_____          _____
                                                                                *Judge's signature*

City and State:  Oklahoma City, Oklahoma          SHON T. ERWIN, U.S. Magistrate Judge
                                                                                *Printed name and title*

## WESTERN DISTRICT OF OKLAHOMA
## OKLAHOMA CITY, OKLAHOMA

STATE OF OKLAHOMA      )
                         )
COUNTY OF OKLAHOMA    )

### AFFIDAVIT

I, Jason Wildman, Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice, being duly sworn, depose and state as follows:

1.      I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since April 2021. I am currently assigned to the Oklahoma City Division. My responsibilities include the investigation of possible violations of federal law, including investigation of white-collar crimes, to include complex financial crimes, securities fraud, money laundering, and economic fraud. During my career, my investigations have included the use of various surveillance techniques and the execution of various search, seizure, and arrest warrants.

2.      The facts set forth below are based upon my own personal observations, reports and information provided to me or the FBI by other law enforcement agents or government agencies, and other documents obtained during this investigation.

3.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1343: Wire Fraud, 18 U.S.C. § 1348: Securities Fraud, and 18 U.S.C. § 1956-1957: Money Laundering, (the "Target Offenses") have been committed, are

1

being committed, and/or will be committed by RABIH KALIDY. The information contained in this Affidavit is submitted for the limited purpose of establishing probable cause to search Trillium Homes LLC, a construction and home building company located at 14209 N Santa Fe Avenue, Suite B, Edmond, Oklahoma 73013 ("SUBJECT LOCATION"), further described in Attachment A, for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

4.      This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary for the limited purpose of establishing probable cause to conduct a search of and for the items described in Attachments A and B for evidence, contraband, and/or instrumentalities of the criminal conduct described herein. Additionally, unless otherwise indicated, wherever in this Affidavit I assert that an individual made a statement, that statement is described in substance herein and is not intended to be a verbatim recitation of such statement. Furthermore, unless otherwise indicated, all statements contained in this Affidavit are summaries in substance and in part. The following is true to the best of my knowledge and belief.

**BACKGROUND AND PROBABLE CAUSE**

5.      Between March 2023 and the present, RABIH KALIDY ("KALIDY") has sold securities totaling at least $1,400,000.00 to at least ten (10) investors known at this time.

2

6.      The securities offered and sold by KALIDY were Convertible Promissory Notes and Membership Interest Purchase Agreements pertaining to Trillium Medical Spa LLC ("**Spa 1**"), and Trillium Medical Spa Plus LLC ("**Spa 2**"), both of which were Oklahoma limited liability companies. The Convertible Promissory Notes were convertible into membership units of the spa limited liability companies.

7.      KALIDY represented that investments would be used to pay for the buildout of **Spa 1**—including the purchase of any equipment, furnishings, supplies, and products needed for its successful operation, as well as fund operating expenses for the first few months of **Spa 1's** initial operation—and to begin the buildout of **Spa 2** at an undetermined location in Oklahoma City. KALIDY represented to investors that it was his goal to open **Spa 1** in October 2023 and subsequently begin the buildout of **Spa 2** in Oklahoma City.

8.      By way of background, Trillium Homes LLC was a construction and home building company located at 14209 N Santa Fe Avenue, Suite B, Edmond, Oklahoma 73013, for which KALIDY was listed as the Registered Agent with the Oklahoma Secretary of State and which was wholly owned by KALIDY. KALIDY represented to investors that Trillium Homes LLC would be used to complete the buildout of both spas.

9.      FBI victim interviews revealed that KALIDY frequently used the Trillium Homes LLC office location to solicit investments from his victims, utilizing his office to host both current and prospective investors. Interviews with victims also revealed that the inside of Trillium Homes LLC was heavily surveilled with cameras covering every square foot of the interior space, to include KALIDY's office. Victims believed KALIDY recorded everything and that the recorded footage was stored in a storage closet within the office. Victim interviews

3

also revealed that KALIDY frequently called investors and prospective investors from inside his Trillium Homes office with updates about the project or new requests for money from his cellular telephone number 405-545-4500.

10.    Contrary to his representations to investors, KALIDY diverted most investor funds to purposes other than the buildout of either **Spa 1** or **Spa 2**.

11.    Specifically, review of bank records obtained through Grand Jury subpoenas revealed that most investor funds were never deposited into a bank account in the name of Trillium Medical Spa LLC, and were instead deposited into KALIDY's personal bank account(s), where they were used to pay expenses related to his home building business, Trillium Homes LLC, and to pay personal and living expenses for KALIDY and his family. KALIDY also used investor funds to pay commissions to at least two individuals who solicited investments on his behalf.

12.    According to FBI interviews of victim-investors, KALIDY frequently provided excuses to investors as to why **Spa 1** construction was incomplete or behind schedule, including, but not limited to, construction costs amounting to much more than originally anticipated and materials or supplies being unavailable or delayed in delivery. As a result, the buildout and equipping of **Spa 1** was not completed as represented in October 2023 or at any time through the end of 2023.

13.    In early 2024, KALIDY represented to investors that he and/or his company, Trillium Homes LLC, had incurred costs of approximately $1,300,000.00 toward the buildout of **Spa 1**.

14.     Following months of little to no progress on **Spa 1**, KALIDY informed investors that he had spent all money raised under the Convertible Promissory Notes and Membership Interest Purchase Agreements, and needed additional money to complete the spa projects. In response, two investors took out $532,000.00 loan to purchase equipment for **Spa 1** and obtained a $100,000.00 line of credit, both in their own names. Through the efforts of these two investors, the buildout and equipping of **Spa 1** was completed and the spa opened on February 22, 2024.

15.     In March 2024, some of the investors obtained documentation revealing that KALIDY's company, Trillium Homes LLC, had only incurred costs and expenses of approximately $330,000.00 relative to the buildout of **Spa 1**, amounting to far less than the approximate $1,300,000.00 that KALIDY had told them he spent. The records obtained by the investors further demonstrated that of the $330,000.00 of costs incurred for the buildout, only approximately $30,000.00 of those vendor costs had been paid. As a result of widespread non-payment, investors reported that many unpaid vendors were threatening to file liens against **Spa 1**. Your affiant has received these documents and reviewed them.

16.     At the time of this affidavit, KALIDY has taken no discernable efforts to acquire a location for or begin the buildout of **Spa 2**.

17.     Based on FBI forensic analysis of KALIDY-owned bank accounts, it is apparent that KALIDY and potential unknown accomplices have failed to account for approximately $1,400,000.00 of investor funds raised relative to the buildout and equipping of **Spa 1** and **Spa 2**. Furthermore, KALIDY refused to provide records and information to an accountant hired by

the two investors running **Spa 1** so that they could prepare their 2023 federal and state income tax returns and Schedule K-1s for investor members on behalf of **Spa 1**.

18.     KALIDY also entered into an additional investment contract with at least one investor, R. Waters ("Waters"), for the represented purpose of building and operating a car wash in Pontotoc County, Oklahoma, through Trillium Supreme Wash Plus LLC. Your affiant has interviewed R. Waters and reviewed the investment contract. Pursuant to the investment contract that was entered into on or about March 24, 2023, Waters invested $300,000.00 and a parcel of land she had inherited from her late father in Pontotoc County, Oklahoma. The plan at its inception was to build and operate the car wash on the land provided by Waters, in exchange for a 50% passive ownership interest in Trillium Supreme Wash Plus LLC, with KALIDY agreeing to use his "intellectual property," project management, site construction, and business development efforts to build, operate, and manage the car wash.

19.     A Real Property Purchase Agreement provided by R. Waters revealed that KALIDY sold the parcel of property in Pontotoc County, Oklahoma on December 5, 2023, to an entity named Ironwood Finance Inc., of Corpus Christi, Texas, and personally retained the entirety of the proceeds of the sale. Additionally, Waters told the affiant that KALIDY refused to return her cash investment when she asked to not participate in the car wash. Furthermore, forensic analysis of KALIDY bank accounts demonstrated that KALIDY used Waters' cash investment of $300,000.00 for purposes unrelated to Trillium Supreme Wash Plus LLC and that KALIDY has taken no discernible efforts to build or open a car wash in connection to the agreement he entered into with Waters.

## <u>Computers, Electronic Storage, And Forensic Analysis</u>

20.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT LOCATION, in whatever form they are found.   One form in which the records might be found is data stored on a computer's hard drive, a smart phone, or other storage media.   Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

21.     *Probable cause.*  I submit that if a computer or storage medium is found at the SUBJECT LOCATION, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

      a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.   Even when files have been deleted, they can be recovered months or years later using forensic tools.   This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

      b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.   In

addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.   To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.   Computer users typically do not erase or delete this evidence, because special software is typically required for that task.   However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.   Based on actual inspection of other evidence related to this investigation, namely financial records and BuilderTrend files, I am aware that computer equipment was used to generate, store, and print documents used in the scheme to defraud investors.   There is reason to believe that there is a computer system currently located on the SUBJECT LOCATION.

22.    *Forensic evidence.*   As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable

8

cause to believe that this forensic electronic evidence will be on any storage medium in the
SUBJECT LOCATION because:

    k.  Data on the storage medium can provide evidence of a file that was once on the
storage medium but has since been deleted or edited, or of a deleted portion of a
file (such as a paragraph that has been deleted from a word processing file).
Virtual memory paging systems can leave traces of information on the storage
medium that show what tasks and processes were recently active.   Web
browsers, e-mail programs, and chat programs store configuration information
on the storage medium that can reveal information such as online nicknames and
passwords.   Operating systems can record additional information, such as the
attachment of peripherals, the attachment of USB flash storage devices or other
external storage media, and the times the computer was in use. Computer file
systems can record information about the dates files were created and the
sequence in which they were created, although this information can later be
falsified.

    l.  As explained herein, information stored within a computer and other electronic
storage media may provide crucial evidence of the "who, what, why, when,
where, and how" of the criminal conduct under investigation, thus enabling the
United States to establish and prove each element or alternatively, to exclude the
innocent from further suspicion.   In my training and experience, information
stored within a computer or storage media (e.g., registry information,
communications, images and movies, transactional information, records of

9

session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic

10

storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

m. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

n. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

o.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

23.     *Necessity of seizing or copying entire computers or storage media.*   In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.   Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.   Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.   This is true because of the following:

p.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.   Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.   Storage media can store a large volume of information.   Reviewing that information for things described

12

in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

q. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

r. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

24. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

13

## CONCLUSION

25.     Based on the foregoing, I respectfully submit that there is probable cause to believe that evidence relating to violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1348 (Securities and commodities fraud), and 18 U.S.C. § 1956-1957 (money laundering) will be found at the SUBJECT LOCATION.   I therefore respectfully request issuance of a search warrant for the SUBJECT LOCATION (as set forth in **Attachment A**) based on the above-mentioned facts.

**FURTHER, YOUR AFFIANT SAYETH NOT.**


JASON WILDMAN
Federal Bureau of Investigation


Sworn to and subscribed before me this ___28___ day of June, 2024.


SHON T. ERWIN
United States Magistrate Judge

14

## Attachment A

### Property to Be Searched

The property to be searched is the SUBJECT BUSINESS, Trillium Homes LLC, 14209 N Santa Fe Avenue, Suite B, Edmond, Oklahoma 73013. This application also requests to search KALIDY's person to ensure that any property held by him is also accessible to Agents engaging in the search.  This application further requests the authority to require KALIDY to provide any biometric identification necessary, including but not limited to fingerprint and/or facial recognition, to unlock his electronic devices, thus providing access to any and all content contained on those devices.





**Attachment B**

**ITEMS TO BE SEIZED**

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1343: Wire Fraud, 18 U.S.C. § 1348: Securities Fraud, and 18 U.S.C. § 1956-1957, namely:

1.    Any and all photographs, notes, documents, records, or correspondence pertaining to the violations described in the affidavit.

2.    Any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized, and forensic copies thereof.

    a.    With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

        i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.    passwords, encryption keys, and other access devices that may be necessary to access the device;

        iii.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

iv.     records of or information about Internet Protocol addresses used by the device;

v.      records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

b.     As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

c.     As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

3. Items which tend to show evidence of plans to travel including, but not limited to, receipts, invoices, rental agreements, ticket stubs, and itineraries.